## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

---------------------------------------------------------------------------------------

ST. JOHNS RIVERKEEPER, INC.,

        Plaintiff,

v.

JACKSONVILLE METAL RECYCLING, INC.,

        Defendant.

---------------------------------------------------------------------------------------

Civil Case No. 3:21-cv-01109

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES

Plaintiff St. Johns Riverkeeper, Inc., by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.    This is a civil suit brought under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, commonly known as the Clean Water Act ("CWA" or "the Act"), to address and abate Defendant's ongoing and continuous violations of the Act pursuant to the Act's citizen suit enforcement provisions at CWA Section 505, 33 U.S.C. § 1365.

2.    Defendant discharges polluted stormwater runoff from its scrap metal recycling facility in Jacksonville, FL 32207 (the "Facility") into the waters of

the United States without authorization, in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and has failed to obtain coverage under and does not comply with the conditions of an individual National Pollutant Discharge Elimination System ("NPDES") permit or the Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity issued by Florida's Department of Environmental Protection ("DEP"), in violation of CWA Section 402(p), 33 U.S.C. §§ 1342(p), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1).

3.    Industrial stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from municipal sewage sources.  With every significant rainfall event, millions of gallons of polluted stormwater originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways.  In most of the St. Johns River watershed, stormwater flows untreated either directly, or through municipal storm drain systems into the St. Johns River and its tributaries.  Stormwater pollution accounts for the majority of the pollution entering the St. Johns River watershed each year.  The effects of nonpoint source pollutants on specific waters vary and may not always be fully assessed. Stormwater pollution poses a health risk to humans, harms marine life, closes beaches, contaminates the ocean, and harms the environment.  These contaminated stormwater discharges can and must be controlled for the St. Johns River watershed to regain its health.

4.      Defendant's stormwater discharges contribute to this endemic stormwater pollution problem.  Defendant engages in industrial activities such as scrap metal processing and recycling.  As precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby surface waters.  Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law in order to allow the St. Johns River watershed a fighting chance to regain its health.

## II.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the parties and this action pursuant to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

6.      On July 28, 2021, Plaintiff provided notice of Defendant's violations of the Act and of its intention to file suit against Defendant to Defendant, Defendant's registered agent; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IV; the Interim Secretary of DEP; and the Northeast District Director of DEP, as required by the Act under CWA Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A true and

correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated herein by reference.

7.      More than sixty days have passed since the notice letter was served on Defendant and the state and federal agencies.  Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

8.      Neither the EPA nor the State of Florida has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this Complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

9.      This action is not barred by any prior administrative penalty under CWA Section 309(g), 33 U.S.C. § 1319(g).

10.      Venue is proper in the United States District Court for the Middle District of Florida pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because both the source of the violations complained of is located and the acts and omissions giving rise to the claims occurred, within this judicial district.

## III.

## PARTIES

11.      Plaintiff St. Johns Riverkeeper, Inc. ("St. Johns Riverkeeper") is a Jacksonville-based non-profit public benefit corporation with members throughout Northeast and Central Florida, including Duval County, St. Johns County, Nassau County, Putnam County, Flagler County, Baker County, Clay

County, Volusia County, Marion County, Lake County, Seminole County, Orange County, Alachua County, Osceola County, Brevard County, and Indian River County.  St. Johns Riverkeeper's mission is to defend the St. Johns River and advocate for its protection.  To further its mission, St. Johns Riverkeeper actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.  St. Johns Riverkeeper has been registered as a non-profit corporation in Florida since 1999 and has maintained its good and current standing in Florida since that time.  St. Johns Riverkeeper is a licensed member of Waterkeeper Alliance, Inc., an international non-profit environmental organization, made up of over 360 separate Waterkeeper programs, such as the St. Johns Riverkeeper.

12.     Plaintiff's members use and enjoy the waters which Defendant has unlawfully polluted and is unlawfully polluting.  Plaintiff's members use those waters for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation.  Defendant's discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA.

13.     The relief sought herein will redress the harms to Plaintiff and its members caused by Defendant's activities.  Continuing commission of the acts

and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

14.     Plaintiff brings this action on behalf of its members, respectively. Plaintiff's interest in reducing Defendant's discharges of pollutants into the St. Johns River and its tributaries and requiring Defendants to comply with the requirements of the CWA are germane to Plaintiff's organizational purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of the Plaintiff's nonprofit organization.

15.     Plaintiff is informed and believes, and thereupon alleges, that Defendant Jacksonville Metal Recycling, Inc. is a corporation incorporated under the laws of the State of Florida, which owns and/or operates the Facility, which is located at 4718 Philips Highway, Jacksonville, FL 32207.

## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

16.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

17.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. An NPDES permit requires dischargers of pollution to comply with various limitations.

18.     NPDES permits are issued by the EPA or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

19.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

### Stormwater Permits

20.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

21.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA

promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.

22.     In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

23.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

24.     40 C.F.R. § 122.26(c)(1) provides that dischargers of stormwater associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit.

25.     40 C.F.R, § 122.26(b)(13) defines "storm water" to include stormwater runoff, snow melt runoff, and surface runoff and drainage.

26.     40 C.F.R. § 122.26(b)(14) specifies that "storm water discharge associated with industrial activity" includes stormwater discharge from facilities classified under Standard Industrial Classification ("SIC") code 5093 (Scrap and Waste Materials).  Facilities in those industrial categories must obtain NPDES permit coverage for their stormwater discharges.

## Florida's MSGP

27.     Florida's Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity is an NPDES permit that is issued by the DEP under the authority of Florida Statute Section 403.0885, which authorizes Florida to implement the NPDES program pursuant to authority delegated to the State of Florida by the EPA.  Pursuant to Florida Administrative Code ("F.A.C.") Rule 62-621.300(5)(a), Florida adopted the EPA's original Multi-Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804) and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534), September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively referred to as the "MSGP").  Thus, Florida has a single, statewide general permit applicable to all industrial stormwater dischargers.

28.     In order to discharge stormwater lawfully in Florida, industrial dischargers must obtain coverage under and comply with the terms of the MSGP or obtain and comply with an individual NPDES permit.  33 U.S.C. § 1311(a).

29.     The MSGP contains a variety of substantive and procedural requirements that all dischargers must meet.

30.     Part XI.N of the MSGP pertains to Sector N facilities.  These are facilities that possess a SIC Code of 5093.  Sector N facilities discharge

stormwater associated with industrial activity from scrap recycling and waste recycling facilities.  In addition to the general requirements that the MSGP imposes on all dischargers, Part XI.N of the MSGP imposes certain additional specific terms and conditions on Sector N Facilities.

31.     The MSGP is built on the expectation that its requirements will predominantly be met through a permittee's use of best management practices ("BMPs").  BMPs can take a wide variety of forms, from frequent sweeping to making structural modifications such as roofing or installing stormwater filtration and treatment, as necessary.

32.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).   In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A).   The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of five "conventional pollutants".  Id. §

1311(b)(2)(E).[1]

33.     Accordingly, the MSGP requires permittees to use BMPs that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the best available technology economically achievable ("BAT"), for toxic and non-conventional pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants.  *See* 60 Fed. Reg. at 50812; *see also* MSGP § XI.N.3.a.3, 60 Fed Reg. at 51190.

34.     The MSGP also requires dischargers to develop and implement a stormwater pollution prevention plan ("SWPPP").  MSGP § IV.  Among other things, the SWPPP records the BMPs applied at a particular industrial facility. Sector N Facilities must develop and implement a SWPPP that comports with several requirements of Part XI.N of the MSGP.  Through the SWPPP, requirements in Part XI.N of the MSGP implement its BAT/BCT requirements for Sector N facilities by requiring that the pollution prevention plan minimize pollution and requiring specific BMPs to effectuate such minimization.  *See* MSGP Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP requirements in this permit operate as limitations on effluent discharges that reflect the application of BAT/BCT.")

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

35.     The MSGP provides that: "[T]he plan shall describe and ensure the implementation of practices that are to be used to reduce the pollutants in stormwater discharges associated with industrial activity at the facility and to assure compliance with the terms and conditions of this permit.  Facilities must implement the provisions of the stormwater pollution prevention plan required under this part as a condition of this permit."  MSGP § IV, 60 Fed. Reg. at 51115.

36.     Part XI.N.3.a(3)(a) of the MSGP requires that Sector N facilities develop and implement appropriate storm water management controls including the following:

(a) Measures and controls to "minimize contact of storm water runoff with stockpiled materials, process materials, and nonrecyclable wastes," as well as "measures to minimize the extent of storm water contamination from those areas."  The facility operator must consider using the following BMPs or their equivalents: diversion of runoff, media filtration, silt fencing, and oil/water separators, sumps, and dry adsorbents.  Part XI.N.3.a(3)(a)(ii).

(b) "measures necessary to minimize contact of surface runoff with residual cutting fluids."  This includes a requirement to consider implementing one of two (or a combination) types of measures – either storage of turnings under cover or a dedicated containment area for turnings.  Part XI.N.3.a(3)(a)(iii).

(c) "measures and controls to minimize residual liquids and accumulated particulate matter, originating from scrap and recyclable waste materials stored indoors or under cover, from coming in contact with surface runoff."  This part requires that dischargers consider including various housekeeping measures.  Part XI.N.3.a(3)(a)(iv).

(d) address "areas where scrap and waste processing equipment are sited" by adopting "measures and controls to minimize surface runoff from coming in contact with scrap processing equipment."  Part XI.N.3.a(3)(a)(v).

(e) provide appropriate source control, stabilization measures, nonstructural, structural controls or equivalent for areas at the facilities that are associated with industrial activity that have a high potential for soil erosion and suspended solids loadings.  This requires consideration of a variety of erosion and sediment control BMPs.  Part XI.N.3.a(3)(a)(vii).

(f) provide for a detention or retention basin or equivalent when BMPs installed pursuant to Part XI.N.3.a(3)(a)(vii) do not prove sufficient.  Part XI.N.3.a(3)(a)(viii).

60 Fed. Reg. at 51190–93 (detailing specific requirements for facilities processing non-liquid recyclable waste).

37.    For Sector N facilities, the MSGP establishes the following cut-off

concentrations for pollutants of concern: chemical oxygen demand ("COD") –

120 mg/L, total suspended solids ("TSS") – 100 mg/L, total recoverable

aluminum – 0.75 mg/L, total recoverable copper – 0.0636 mg/L, total recoverable

iron – 1.0 mg/L, total recoverable lead – 0.0816 mg/L, total recoverable zinc –

0.117 mg/L.  MSGP, § XI.N.5.a; 61 Fed. Reg. 5248 (February 9, 1996) (amending

cut-off concentration for zinc).  The cut-off concentrations are used "to assess the

effectiveness of the pollution prevention plan and to help ensure that a reduction

of pollutants is realized."  60 Fed. Reg. at 50843 (Monitoring and Reporting

Requirements).  They "provide a reasonable target for controlling stormwater

contamination by pollution prevention plans."  *Id*. at 51076.

38.    The cut-off concentrations are guidelines for determining whether a

facility has implemented the requisite BAT/BCT level of control measures.

Further, exceedances of cut-off concentrations are reason for concern that

pollution may have reached a level "at which a stormwater discharge could

potentially impair, or contribute to impairing water quality or affect human

health from ingestion of water or fish."  60 Fed. Reg. at 50824–25.

### CWA Citizen Enforcement Suits

39.    Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may

commence a civil action in federal court on his own behalf against any person

who is alleged to be in violation of an "effluent standard or limitation" under the

CWA.

40.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342. CWA Section 505(f), 33 U.S.C. § 1365(f).

41.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

42.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

43.     Violators of the Clean Water Act are also subject to an assessment of civil penalties of up to $56,460 per day per violation.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

## Metal Recycling Facilities

44.     Metal recycling facilities, especially those with outdoor stockpiling, processing and segregation of materials, have been identified as a major source of stormwater contamination.  Scrap metal in different stages of corrosion and decay may release a variety of harmful substances including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid,

lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical residues.  60 Fed. Reg. 50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995); *see also* id. at 51189–97 (outlining special requirements for Sector N); EPA, *Industrial Stormwater Fact Sheet Series: Sector N*, EPA-833-F-06-029, at 2–4 (Dec. 2006), https://www.epa.gov/sites/production/files/2015-10/documents/sector_n_ scraprecycling.pdf  (listing common pollutants associated with Sector N, as of 2006).

45.     In addition to the storage and processing of various sources of scrap metal, such facilities also conduct vehicle operation and maintenance and equipment operation and storage.  Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises.  Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

### Defendant's Facility

46.     In 2012, Defendant sought permit coverage for its industrial stormwater discharges under the MSGP, which became effective on November 5, 2012.

47.     The Facility ID for documents submitted to DEP was FLR05H439.

48.     On its Notice of Intent to Use Multi-Sector Generic Permit for Stormwater Discharge Associated With Industrial Activity ("NOI"), signed by

Defendant on November 2, 2012, Jacksonville Metal Recycling certified that the Facility is classified under Standard Industrial Classification ("SIC") Code 5093.

49.     The NOI stated that the Facility collects and discharges stormwater through at least two discharge locations (outfalls).  Defendant certified that these outfalls discharge to an unnamed ditch that flows to the St. Johns River.

50.     The Facility's coverage under the MSGP expired on November 4, 2017.

51.     Defendant failed to submit a subsequent NOI to renew its permit coverage.  Therefore, since November 4, 2017, Defendant has operated without coverage under the MSGP or any individual NPDES permit.

52.     According to its website, the Facility purchases both ferrous and non-ferrous scrap metal.  The Facility is open Monday-Friday, 8 am – 4 pm.

53.     The majority of activity and storage at the Facility takes place outdoors, where pollutants are exposed to stormwater.

54.     Because Defendant controls the industrial activities that take place at the Facility, Defendant is responsible for managing stormwater associated with those activities at the Facility in compliance with the CWA.

55.     Defendant is the person, as defined by CWA Section 502(5), 33 U.S.C. § 1362(5), responsible for the violations alleged in this Complaint.

**<u>Defendant Discharges Polluted Stormwater from the Facility
into Waters of the United States</u>**

56.     During precipitation events, stormwater flows freely from the Facility into an unnamed ditch that is hydrologically connected to the St. Johns River.

57.     The St. Johns River is a "water of the United States."

58.     Defendant's industrial activity at the Facility has caused and continues to cause a "discharge of pollutants" within the meaning of CWA Section 502(12), 33 U.S.C. § 1362(12), and a "storm water discharge associated with industrial activity" within the meaning of 40 C.F.R. § 122.26(b)(14) from the Facility on at least each and every day that there has been a precipitation event greater than 0.1 inches.  (EPA has determined that precipitation greater than 0.1 inches in a 24-hour period constitutes a measurable precipitation event for the purposes of evaluating stormwater runoff associated with industrial activity. *See, e.g.*, 40 C.F.R. § 122.26(c)(i)(E)(6) (using 0.1 inches as the distinguishing threshold of a storm event)).

59.     Moreover, between November 5, 2012, and November 4, 2017, the period during which Defendant had MSGP coverage, Defendant engaged in the self-monitoring of its stormwater discharges.  Defendant's stormwater samples showed numerous exceedances of the cut-off concentrations for pollutants of concern.

60.     The levels of aluminum in stormwater discharged by the Facility have exceeded the cut-off concentration for aluminum of 0.75 mg/L established

by the DEP. Defendant measured levels of aluminum in excess of 0.75 mg/L in stormwater discharged from the Facility in nearly half of the samples it collected during 2013 and 2015.

61.     The levels of iron in stormwater discharged by the Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP. Defendant measured levels of iron in excess of 1.0 mg/L in stormwater discharged from the Facility in nearly half of the samples it collected during 2013 and 2015.

62.     The levels of lead in stormwater discharged by the Facility have exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP.  Defendant measured levels of lead in excess of 0.0816 mg/L in stormwater discharged from the Facility in several samples it collected during 2013 and 2015.

63.     The levels of zinc in stormwater discharged by the Facility have exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP.  Defendant measured levels of zinc in excess of 0.117 mg/L in stormwater discharged from the Facility in nearly half of the samples it collected during 2013 and 2015.

## VI.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Unlawful Discharge of Pollutants Without a Permit**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

64.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

65.     CWA Section 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA.  Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

66.     CWA Section 502(5), 33 U.S.C. § 1362(5), defines "person" to include "an individual, corporation, partnership [or] association."

67.     CWA Section 502(12), 33 U.S.C. § 1362(12), defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."

68.     CWA Section 502(14), 33 U.S.C. § 1362(14), defines "point source" broadly to include "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

69.     CWA Section 502(7), 33 U.S.C. § 1362(7), defines "navigable waters" as "the waters of the United States, including the territorial seas."

70.     40 C.F.R. § 122.2 defines "waters of the United States" to include,

*inter alia*: (i) "All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide"; (ii) "All interstate waters, including interstate 'wetlands'"; (iii) Tributaries to such waters; (iv) Wetlands adjacent to such waters or their tributaries; and (v) "All other waters . . . the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce."

71.     CWA Section 402(p), 33 U.S.C. § 1342(p) and the implementing regulation found at 40 C.F.R. § 122.26(a)(1)(i), require facilities discharging stormwater associated with industrial activity to obtain an NPDES permit.

72.     Between November 5, 2012, and November 4, 2017, the period during which Defendant had MSGP coverage, Defendant's stormwater samples showed numerous exceedances of the cut-off concentrations for pollutants of concern.

73.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed to abate these discharges of excessively polluted stormwater.

74.     Defendant has discharged and continues to discharge stormwater associated with industrial activity that contains pollutants from point sources to waters of the United States without an NPDES permit.

75.     Each and every day since November 4, 2017, on which Defendant discharges stormwater associated with industrial activity without authorization under an NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

76.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

77.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
**Failure to Apply for NPDES Permit Coverage**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

78.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

79.     40 C.F.R. § 122.26(c)(1) and 122.26(e)(1) require dischargers of stormwater associated with industrial activity to apply for an individual permit or seek coverage under a promulgated stormwater general permit by October 1, 1992.

80.     Since at least November 4, 2017, Defendant has operated and continues to operate a facility that engages in "industrial activity" as that term is defined in 40 C.F.R. § 122.26(b)(14).

81.     Since that time, Defendant has routinely discharged polluted

stormwater associated with industrial activity from the Facility to waters of the United States.

82.     Therefore, since that time, Defendant has been obligated to apply for coverage under an individual or general NPDES permit.

83.     Once Defendant began discharging polluted stormwater associated with industrial activity to waters of the United States, each and every subsequent day on which Defendant failed to apply for permit coverage constitutes a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.

84.     Continuing commission of the acts and omissions alleged herein irreparably harms the waters of the State, Plaintiff, and its members, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

85.     Wherefore, Plaintiff prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Implement Adequate Control Measures and
Best Management Practices
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

86.     Plaintiff incorporates by reference all preceding paragraphs as if set forth herein.

87.     The MSGP's SWPPP requirements oblige Sector N dischargers to reduce or prevent pollutants in their stormwater discharges through

implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

88.    As evidenced by its numerous exceedances of applicable cut-off concentrations, Defendant has failed to implement BAT and BCT at the Facility for its discharges in violation of Part XI.N of the MSGP.

89.    Each day since September 5, 2016 that Defendant has failed to develop and implement BAT and BCT in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

**VII.**

**PRAYER FOR RELIEF**

90.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

    a.  Declare Defendant to have violated and to be in violation of the Clean Water Act as alleged herein;

    b.  Enjoin Defendant from discharging pollutants from the Facility except as authorized by and in compliance with an NPDES permit;

    c.  Order Defendant to immediately apply for coverage under, and comply fully with all applicable requirements of, the MSGP (or an individual NPDES permit that is at least as stringent);

d.  Order Defendant to take appropriate actions to remediate the harm caused by its violations of the MSGP and the Clean Water Act, to the extent possible;

e.  Order Defendant to pay civil penalties, pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a), and by 40 C.F.R. §§ 19.1 – 19.4;

f.  Order Defendant to pay the costs of litigation, including Plaintiff's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

g.  Award any such other and further relief as this Court may deem appropriate.

Dated this 3rd day of  November, 2021

Jacksonville Beach, Florida

Respectfully submitted,

By:  /s/ John November

John November
THE PUBLIC TRUST
ENVIRONMENTAL LEGAL
INSTITUTE OF FLORIDA, INC.
2029 North Third Street
Jacksonville Beach, FL 32250
(904) 247-1972
john@publictrustlaw.org

*Attorney for Plaintiff*

By: /s/ Benjamin Pierce

Benjamin Pierce
SUPER LAW GROUP, LLC
110 Wall Street
New York, NY 10005
(212) 242-2355
ben@superlawgroup.com

*Attorney for Plaintiff*